Good morning, Your Honors. May it please the Court, Eric Grant for Plaintiffs and Appellants. Just to be clear, Judge Kleinfeld, I represent the good guys. Thank you for the help. A reasonable jury could find that the defendants deceptively obtained a search warrant, that executing that warrant at 5 o'clock in the morning and ransacking plaintiffs' residence for over five hours in the presence of their terrified minor children, they nonetheless found no drugs, no drug paraphernalia of any kind, indeed, quote, nothing illegal, unquote, of any kind. Nonetheless, these officers arrested Mr. Collins, hauled him off to jail where he sat for nearly three months until when... Counsel, if I could just interrupt you for a moment. Isn't it correct that Mr. Collins has an obligation to make a substantial showing that Detective Patton deliberately or intentionally omitted material facts from the affidavit attached to the warrant? In his claim of judicial deception, yes. And that's the basis of your claim, right? Yes. Okay. Now, what exactly, what showing has your client made to meet that obligation? We identified four things, Your Honor, at pages 14 through 17 of our appellant's opening brief. One, the detective deceptively omitted Mr. Collins' lack of criminal history, especially in contradistinction to the other two individuals. What's deceptive about that? That seemed to be the primary argument. You didn't tell the judge when you got the search warrant that this fellow had a clean record. I don't understand why it's deceptive to leave that out, or I don't recall when I used to sign search warrants seeing people's rap sheets at all, actually. Your Honor, the detective himself stated that a criminal record was a, quote, a factor in support of the finding of probable cause, unquote. Well, if he had a record, if he was a career dope dealer with multiple busts, that would certainly increase the probability, but there's always a first time. It wasn't his time, though, Your Honor. That's true. But I don't understand why it's deceptive not to tell the judge a negative, no record. It's deceptive in this context because the whole method of the warrant was to paint Mr. Collins in association with two dead friends, and that looked like the major reason for seeking the warrant. However, what words in the affidavit imply, without saying in so many words, that Collins had a record? What I mean is if the warrant application, the affidavit, makes the judge think, oh, this fellow must have a rap sheet as long as your arm and actually has a clean rap sheet, nothing, that would be deceptive. But what is there in the affidavit that does that? I think the answer to that, Your Honor, is that in context, in presenting what was literally 20 pages. I'm looking at it. That's why I'm asking for your help. It's long. To paint all of the evidence against the other two individuals. They're long rap sheets for drugs. This isn't a trial we're talking about. We're talking about an affidavit to get a warrant. It's not a trial. Of course they're going to present the evidence that they think is an adequate basis to take the action that they did. Are you suggesting that it is unlawful for them to focus only on the things that they think are the basis for getting the warrant, but instead have to say, well, we have this information, but, you know, it may not be right because we have this other information on the other side. Are you suggesting that's required? No, Your Honor. What I'm suggesting, and first of all, it's important to be clear about the standard here. It's not a question of what the members of this Court believe, but whether a reasonable jury could find that this was deceptive in context. With respect, I'm not sure that's correct. As a court of appeal, what you're doing is you're trying to determine that the officer here acted with an intent to deceive basically the judicial process. In other words, he misrepresented, lied, fabricated things in order to get a warrant. We're a long way from a jury on that. We're really talking about your client has a burden to show how deception occurred here. Judge Feinfeld asked you to point to the affidavit. Where in the affidavit was deception practiced? What I'm hoping for there, I looked at it, and I thought of it like when I was U.S. magistrate, signing these things all the time. What would have fooled me? And I can't find it, but yours must be tabbed and highlighted and circled, and you can find it, so just show me. Well, first, in response to Judge Smith's question, this Court has said in Butler v. Elie, which we cited in our brief, that the defendant's state of mind is a question of fact for the jury. So the question here is whether any reason would work. You don't get to take everything to a jury. Show us what there is here. True, Your Honor. The four things that I identified, again, these are omissions in the Butler case. Hold on. Let's narrow this down a little, like page, page number. And before you get there, counsel, let me quote from Butler v. Elie, because that's your standard here. I want to be sure that when you're pointing things out to us here, that you're going to satisfy this standard, because there, in order to overcome qualified immunity, the plaintiff has to make a substantial showing. The police officer obtained the warrant through deliberate falsehoods or reckless disregard for the truth and established that but for the dishonesty, the magistrate would not have issued the warrant. That's the standard that you have to show. Yes, Your Honor. So following up on what Judge Kleinfeld requested, where in the affidavit do you meet that standard? Again, there are two significant omissions. One is the criminal history. Omissions? Yes. Okay, but point to the part of the affidavit where there's an implication that it does have a criminal history so that it's tricky not to disclose that it doesn't. I can't find anything. Your Honor, I — There's a notion here about checking, I think it was Dossman's. Yeah, I conducted a CLETS criminal history check on Dossman. Okay, so we know that Dossman has a rap sheet that's pretty impressive. And there's nothing there about Collins. Now, you're saying it's deceptive to have nothing there. I don't see where anybody could be deceived unless it implied that there was a criminal history for Collins. Your Honor, our point is that given the 20 pages of description of the activities, primarily of Gibson and Dossman, painting — You keep avoiding my question. I read all the stuff about activities, and the way I read the affidavit is these other two fellows, particularly this Dossman, seem like career dope dealers. And this fellow Collins that nobody knows anything about is having constant interchange with him and he's observed in what appeared to be some sort of exchanges with him, so they want to check out Collins. That's how I read the affidavit. What am I missing? Your Honor, I guess I — the omissions are not convincing, so I won't — But you have the burden. You have the burden. If you think the omissions meet the burden, then I guess that's your choice. Butler was an omissions case. I'll go on to the next one. The third point is that the affidavit describes on page 637 the above-aforementioned activities described were, quote, consistent with hand-to-hand narcotics. Page 637. I'm looking at the — I guess these are bait stamps at the bottom. Do you see those? I think they're in the upper right-hand corner, Your Honor. The — I'm not seeing it. 637 in the top left. 10-207. Oh, 10-207. Okay. All right. Okay. No, in the upper right-hand corner, Your Honor, of the — He says what it looked like is hand-to-hand exchanges. Yeah. And what was described above were things like going to the Outback Steakhouse and having a steak for an hour. In addition, the affidavit recounted at page 632 that there were various transactions with people. On cross-examination, the defendants admitted — It's a search warrant affidavit. What's he supposed to do, walk up to the guys at Outback and say, excuse me, did you just exchange dope for money? Your Honor, he admitted on cross-examination later that there was nothing suspicious about that transaction. Yet he said in the warrant that all of these activities were consistent with hand-to-hand transactions and drug transactions, when, in fact, he admitted later they were not. So I think in combination, the omissions and the two other — Wait. He said consistent. He didn't say he saw it. A doctor will say that thickened nerves in the wrist are consistent with the carpal tunnel syndrome from repetitive strain injury. They're also consistent with low thyroid production. Consistent doesn't mean that's what it is. It means it's one of several explanations it's consistent with. Well, Your Honor, I appear not to be convincing you on this point. I'd like to go on to the arrest itself. I don't know why you think that. I don't really mean to imply that you're not convincing me. What I want is more help. Well, my best shot was pages 14 through 17 of the opening brief, and there are four items identified there. But I would like to go on in the limited time I have to the arrest. Even if the search warrant were proper, it's our submission that having done a five-hour search, having ransacked the plaintiff's residence, the defendants found nothing. And, in fact, there is evidence from which a reasonable jury could infer that the so-called white residue, the powder in a plastic bag, was field tested and found actually not to be narcotics. And the defendants deceptively omitted that from their report, basically hung the prosecutor out to dry, so she had to go in front of the examining magistrate and tell him that the drugs had not been tested, when, in fact, a reasonable jury could find that they had. And so what we're left with are plastic sandwich bags, computers, and cell phones, things that I would submit most American households have and that in and of themselves are perfectly innocent. The defendants themselves admitted that the most important item seized was that so-called white residue in that bag. But, again, on pages- It wasn't dope, right? It was not dope. And there is evidence from which a reasonable jury could infer. And we put this on pages 31 and 32. Did they have a means at the scene for screening to see if it was dope? They had a drug-sniffing dog. The Sacramento Police Department general order that's applicable provides that generally a field test, a so-called Valtox test, should be done prior to booking. Defendant Trefethen testified that that was the normal- Prior to booking. Prior to arrest. Prior to arrest. At the scene, a field test. That's what the- Bring along some reagent and do a field test before they arrest somebody? Yes, that's what the Sacramento Police Department general order provides, and we cite to that in footnote 9 of our opening brief. Defendant Trefethen testified that that was the normal process, and Plaintiff Mrs. Collins testified that she saw a male officer carry this baggie out into the garage and ask for a witness. And the inference that the drugs were, in fact, field tested and the test was negative, I think is confirmed by the fact when Defendant Patton later found out the results of the laboratory test, he was, quote, that did not surprise him. So we think that a reasonable jury could find that these defendants knew at the time that the white residue was not that was totally lacking in probable cause, a finding that the examining magistrate made. In fact, she gave the prosecuting attorney a chance, one last chance to make her case and then- Let's say absolutely nothing turned up in the search. If anything, it's exonerating. Would they have probable cause for arrest because of their observations of Collins with the two bad guys? Absolutely not, Your Honor. In fact, on page 24 of our brief, we quote their own testimony of the defendants themselves. There was no evidence, quote, that indicated somebody was arrestable before the search. It had to be after the service of the search warrants. Both Defendant Shrum and Defendant Schindler said similar statements that we quote on page 24. And I see that I'm out of time, Your Honor. Thank you. Counsel. Good morning. May it please the Court, my name is Sherry Chapman. I represent the Respondents, City of Sacramento, the police officers, and the police clerk. This case is about the execution of a valid search warrant. Could you help me on the arrest part? That's the part of the case that's most troublesome for me with respect to your case. It looks like absolutely everything they found, multiple digital scales. I've got one in my kitchen, one in my dark room, and one in the room where I pack things for trips. And multiple computers. Let's be clear about that. I got computers all over the house. Plastic bags in a room other than the kitchen. Yep, got those in the room I use to pack my suitcase every couple weeks. Multiple phones, got that. Plastic bag with white stuff. My wife's always putting toiletries and talcum powder and whatnot in little plastic bags for travel so she doesn't take the large economy size that's at home. I don't understand what they found. It looks to me like when they did the search, everything came up clean as a whistle. I can't see what's there that looks like the criminal. Your Honor, it was a combination of factors. It was the activity that they observed during the investigation where they perceived the appellant and his best friend and his longtime acquaintance of 15 years engaging in activity that was consistent with narcotic trafficking. In addition to that, it was the evidence that was found. Black justified the search warrant. They observed all these things. Correct. That look like this fellow Collins, whom they don't know, is engaged in an awful lot of brief contacts that look like hand-to-hand exchanges with two people they do know are dope dealers. So they get a search warrant. Correct. We're fine so far. Right. But then the search warrant comes up clean as a whistle, as far as I can tell. It really didn't, Your Honor. What's dirty? Well, it's important to recognize that the prosecution in this case was for criminal conspiracy. It wasn't for mere possession of narcotics. What's dirty? They could have arrested him without the search warrant if they had enough without the search. The officers have testified that until they performed the search, he wasn't arrestable. That's not disputed in this case. Okay. So what did they find in the search? They found large amounts of rock and powder cocaine at his best friend's residence, his acquaintance of 15 years' residence. Did they find anything in the search of Collins' house? They did. They also found a gun on the boat that he shared with one of the defendants. I got more guns than he does. Well, these are all factors that are leading up to why these officers are entitled to qualified immunity. What's dirty about a gun? I mean, in America, what do we have? Maybe half the households in America have guns? Your Honor, I'm the last person to say there's anything dirty about the mere possession of a gun. But the problem is that's not the only fact in this case. In addition to the large amounts of rock and powder cocaine found at his best friend's house, the gun found on the boat that he shared with his best friend, they found a digital scale, numerous plastic baggies, a plastic bag with white residue, a pay-o-ledger. Digital scales are just great if, oh, for dieters or if you work in your dark room or if you want to know whether to put an extra stamp on the envelope. What's dirty? It's the inference that can be drawn from this evidence when you're looking at it through the eyes of our narcotics detective. And the standard to be applied to the arrest claim is qualified immunity. Whether a reasonable officer under all of the circumstances known to him could have a gun. Can I go to a different issue here? Then we'll work backwards. Let's take the negligence claim. That's not subject to any of the qualified immunity. It's not subject to, you know, any of the things that would otherwise benefit the government here. Why isn't the negligence claim a good claim? Because of Government Code Section 820.4, California Government Code, which provides that if officers exercise due care in enforcing the law, which renders them immune from liability for the plaintiff's injuries, they're immune from liability, as is the City, also pursuant to the Government Code. So you're saying that 820.4 protects the officers from a negligence claim? Yes. As long as they are exercising due care in enforcing the law. Back to your Honor. But isn't that a jury question, whether they did exercise due care? If there's any facts to demonstrate that they did not exercise due care, but the facts of this case demonstrate that the officers did, they obtained a search warrant, they conducted the search, after the search, which showed narcotics packaging materials at a police station. But that gets to what Judge Kleinfeld said. I mean, there is an innocent explanation for each of the things found in the personal residence. I realize it's a conspiracy claim, but I'm puzzled as to why the negligence claim, where you don't have the prosecutorial immunity and qualified immunity, all that. That doesn't apply here unless 820.4 covers the void. And do you have any case law that suggests that 820.4 covers a negligence claim? In other words, why can't you get this to a jury? I unfortunately don't have a case citation to provide to you, Your Honor. Hopefully it was in my brief. I don't recall it offhand. Would you mind sending us a 28-J letter afterwards that would have some case law that would substantiate your position that a negligence claim would be barred in this circumstance? Yes, Your Honor, I will do that. If I may go back to Your Honor's concerns about the qualified immunity argument with respect to the arrest. Qualified immunity is very important. The Supreme Court has found that law enforcement officers who reasonably but mistakenly conclude that there was probable cause for an arrest are immune from liability. This is a very important immunity. If a reasonable officer could think that there was probable cause. Right. And the standard for probable cause in an arrest is that an officer, considering all the facts that were known to that officer at the time of the arrest, not the facts that are later known, not whether the evidence ultimately determines that they are liable. Is it true that your side concedes that there was not probable cause for arrest prior to the search? Yes, Your Honor. That is what Detective Patton, the lead detective, has testified, that he did not have cause to arrest until after the search. And your position is that he was right? Yes. So it has to be something that turned up in the search of Collins' house that added enough to what they had previously observed so that a reasonable officer could believe that there was probable cause. That there was a fair probability that the appellant had engaged in criminal behavior. Qualified immunity is a lenient standard, and it gives deference to a law enforcement officer in the field who has to make a close call as to whether there's probable cause or there's not probable cause to arrest. And here, in addition to the activities that were observed during the investigation, narcotics packaging material was found at the appellant's residence. Basically, Your Honor, this is a case of it walks like a duck, talks like a duck, it must be a duck. Appellant Herb Collins held himself out to be a drug dealer. He hung out with drug dealers. He engaged in activity that was consistent with narcotics transactions. Wait, did he say Collins held himself out as a drug dealer? He liked the lifestyle. That was basically his testimony at the deposition. He liked the lifestyle of his friends. He liked the fast lifestyle. You said held himself out as a drug dealer. I'm not talking now about having friends who are or thinking it's cool to be in a bar where drug dealers are. He did not state that he sold drugs. When you say held himself out. He was living the lifestyle and liked the allure that it brought with it. Did he say I'm a drug dealer to people? No, of course not. He would not admit that at a deposition. So you're saying the rich and famous are all liable for arrest? What about Donald Trump? Are you suggesting that Donald should be arrested? No, this is not a case. No, this is not a case where he simply liked being rich and famous. His best friend. When you say held himself out, you don't mean the way we'd use the words holding out in a whole range of civil cases, intellectual properties? No, he wanted to be perceived as somebody who was associated with no drug dealers, with a motorcycle group. He liked looking like a bad boy, and he attempted to appear that way to other people. So we could arrest for meth everybody that buys a Harley Davidson. I don't think he drove a Harley Davidson, but no, that's certainly not our contention here. I'm really puzzled by something. You know, you have confirmed that before the search, there was no basis for an arrest. You knew before the search that Mr. Collins hung around with drug dealers. You knew it was a conspiracy theory and so on. Did you know about the gun on the boat before the search? No, the officers observed various activities. That wasn't even his boat, right? It was a boat that was registered to him at the marina. The legal ownership of that boat is in dispute. But the reality is, other than something found later on, if there was no basis for arresting him on conspiracy charges before the search, which is, I gather, what you conceded, what occurred at the time of the search that gave these officers more basis for the arrest? There was the evidence of narcotics packaging material at his house. Narcotic packaging material. Could you say what you mean? That's conclusory. It's a legal conclusion, I suppose, that this is narcotic packaging material. Tell me, what material? The detectives have testified the existence of a digital scale in the master bedroom, numerous plastic baggies, the plastic bag with the white residue in it, was all factors in the pay-o-ledger. But the dog, the dog, the drug-sniffing dog didn't key on that packaging, did he? There's no evidence that the packaging was still in the house when the dog went through. Detective Patton testified that it's common to bring a canine through after they've searched the residence to make sure they didn't miss anything. Was there any testimony one way or the other about field testing the stuff or having the dog sniff the stuff? There was testimony about the field testing. And what was the testimony? The officers have testified that none of them performed the field test. There is a general order that they would not perform the field test. Did they testify about whether they could have performed a field test? It was all speculation. There were several different officers involved. This was a multi-location search. What was all speculation? About whether they could or could not. Did they have a reagent with them? None of them specifically recalled that they said it was common to have a kit with them. They said it's common to have a kit, but I don't remember whether we had one? Yeah. Their testimony was two years after this occurred, so they did not have specific recollection. However, your Honor. They said we don't have a specific recollection, but the routine is you carry the reagent for field testing. Yes. And under certain circumstances, you would submit a substance to a field test. However, two of the detectives have testified under circumstances here you would not do a field test because there was only trace residue, and it would be improper to take that little bit amount of evidence and subject it to a field test. What about the dog? Was there – what was the testimony about having the dog sniff it? There was testimony that the dog showed an interest in the vehicle, a pallet. There was no testimony. The dog got excited about the passenger seat in the Mercedes. But I'm asking about the plastic bag. There was no testimony that the plastic bag was still in the residence when the dog did the follow-up search to see if the officer was going to take it. I thought the policeman had the dog, and he had the plastic bag. Did he hold the plastic bag in front of the dog to see if the dog got excited? There has been no testimony as to that. Detective Patton, the lead detective, has said the intent of having the canine there was basically and generally is in these circumstances to see if they've missed anything. So the inference from that is that it could have been – So did you have the dog sniff the plastic bag? But I gather nobody asked him. Nobody asked him, and we will concede the fact that the dog did not alert to anything in the house. Now, these plastic bags, I'm wondering if I have the right picture in my mind. I have three sizes of plastic bags in the bedroom I use to pack my luggage. I've got the snack size, the sandwich size, and the gallon size. And they're the kind you buy at the grocery store. So that's naturally what I'm having in my mind as I picture what the police found in Collins' house. Do I have the right thing in mind, or is it some other kind of plastic bag? They were gallon bags and then smaller bags. I'm not sure if they were the snack or the sandwich bags. Were they the kind you get at the grocery store or something you get at a chemistry laboratory facility? All the evidence seems to indicate it's something that – just normal plastic bags. But the officers have testified that, in their experience, when you have – saying it's narcotics packaging material is like saying that, oh, the gun that's in virtually every motor home in Alaska is dope dealer, dope protection weapon. It's just speculation. But that's not what the officers are saying here. They're saying, based on their experience as seasoned narcotic detectives, the existence of a digital scale, plastic baggies, a baggie with white residue that incidentally was a narcotic. It was just a legal narcotic. The existence of a pay-o-ledger, numerous cell phones, numerous laptops in the home are indicative. Could you point this in the excerpts to the pay-o-ledger, the page number? I couldn't find it when I looked. I believe my reference is to page 233 that discusses a specific name, phone number, and a dollar amount. Excerpt of the records, page 233. And, Your Honor, this Court has held part versus part. Excuse me. I'm going to ask a question here. There's a provision of the California Code, which arguably would apply, but it was never cited by the parties, and I wonder if it was deliberate. That's 820.2, which says that, except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission, where the act or omission was the result of the exercise of the discretion vested in him. It seems to me there may be room for argument under that statute, but nobody has raised it. I wondered if that was deliberate, not to raise that statute, or if it was an oversight. If I recall correctly, Your Honor, we initially did raise that, but the district court did not discuss it, so it hasn't been raised as an issue since then. The district court simply, I believe, relied on 820.4 and determined, because there was probable cause to arrest, the negligence action could not survive. It is our position that the officers are entitled to discretionary immunity. They have to make split decisions in the field based on limited evidence available to them at the time. So it wasn't raised to us because the thought was it wasn't required. That's my understanding, Your Honor. The district court didn't directly rule on that issue, if I recall correctly. That's why it wasn't raised here. If I may briefly, in the few seconds that I have left, this Court in Hart v. Parks has found it is settled law that officers may draw on their own experience in specialized training to make inferences from and deductions about cumulative information available to them that might well elude the trained person. The fact that other inferences are possible does not mean that there is a triable issue of fact as to whether there was probable cause for an arrest or prosecution. Thank you. Thank you. I think we exhausted all the time.
judges: Tg Nelson, Kleinfeld, M. Smith, Cjj